# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**MICHAEL ANTHONY TRAPP**, *et al.*,<br><br>Defendants. | Criminal No. 16-159 (PAD/BJM) |

## REPORT AND RECOMMENDATION

Michael Anthony Trapp, Raymond Alexander Garraway, and Cordwell Nathaniel Bennett were indicted with drug crimes under the Maritime Drug Law Enforcement Act ("MDLEA" or "Act"), 46 U.S.C. §§ 70501–70508, after the U.S. Coast Guard allegedly caught them in the Caribbean Sea aboard a Grenadian vessel that was carrying marijuana and traveling eastward. Contending that the Act unconstitutionally permits the government to prosecute drug trafficking on the high seas without showing any connection between the drug trafficking and the United States, defendants moved to dismiss the indictment for lack of jurisdiction. Docket Nos. 43, 44, 49. The government opposed. Docket No. 51. This matter was referred to me for a report and recommendation. Docket Nos. 52, 53.

For the reasons set forth below, the motions to dismiss should be **DENIED**.

## BACKGROUND[1]

On March 1, 2016, the U.S. Coast Guard encountered an 80-foot vessel—the *F/V Captain Richards*—in the international waters of the Caribbean Sea. As the coastguardsmen approached, individuals aboard the *Captain Richards* began jettisoning marijuana-filled packages. Upon reaching the *Captain Richards*, the coastguardsmen conducted right-of-approach questioning. In response, the *Captain Richards*'s captain refused to disclose the vessel's last port of call, expressed that the purpose of the vessel's voyage was "transiting," and claimed that the vessel was Grenadian.

---

[1] This account is drawn from an FBI agent's affidavit, Docket No. 1-1, and Commander Gregory M. Tozzi's certification, which was certified by the Secretary of State. Docket No. 51-2.

The U.S. Coast Guard discovered that the *Captain Richards* departed from Grenada, and contacted Grenada's government to verify the vessel's claimed nationality. Docket No. 51-2 ¶ 4(b). Around this time, the coastguardsmen boarded the *Captain Richards* and retrieved 918 pounds of marijuana from a debris field within the international waters. On March 2, Grenada confirmed that the *Captain Richards* was Grenadian. Docket No. 51-2 ¶ 4(c). On March 4, the United States asked Grenada to waive its primary right to exercise jurisdiction over the *Captain Richards*, its cargo, and its crew, to the extent necessary for the enforcement of United States law. Docket No. 51-2 ¶ 4(e). On March 8, Grenada waived its primary right to exercise jurisdiction over the vessel, its cargo, and its crew. Docket No. 51-2 ¶ 4(f).

## DISCUSSION

Defendants contend that Congress lacked constitutional authority to enact the MDLEA, and that the Act violates the Fifth Amendment's Due Process Clause by criminalizing conduct lacking a nexus to the United States.[2] Before delving into these constitutional challenges, the statutory basis for MDLEA jurisdiction should be evaluated.

**I.  The Act**

The MDLEA makes it unlawful for any person to "knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board" three categories of vessels, including, as relevant here, vessels "subject to the jurisdiction of the United States." *See* 46 U.S.C. §§ 70503(a)(1), (e)(1)–(2). The Act expressly applies to offenses "committed outside the territorial jurisdiction of the United States," *id.* § 70503(b), and the MDLEA contains no explicit requirement that there be a nexus between a defendant's criminal conduct and the United States. *See United States* v.

---

[2] While defendants, at first blush, appear to mount a facial challenge to the MDLEA, their motion is better read as raising an as-applied challenge to the Act. Indeed, though defendants open with the broad pronouncement that the Act "is an *ultra vires* exercise" of congressional power, Docket No. 43 at 3, they later clarify that their contention is that the MDLEA "cannot constitutionally reach" their alleged "non-piratical conduct." *Id.* at 13. Their due process argument, too, sounds in the tone of an as-applied challenge to the MDLEA. *See id.* at 14–15.

*Nueci-Peña*, 711 F.3d 191, 197 (1st Cir. 2013). A vessel "subject to the jurisdiction of the United States" is defined to include "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." *Id.* § 70502(c)(1)(C). This consent or waiver "may be obtained by radio, telephone, or similar oral or electronic means," and "is proved conclusively by certification of the Secretary of State or the Secretary's designee." *Id.* §§ 70502(c)(2)(A)–(B).

The "exact timing of a flag nation's permission is not a condition to consent under subsection (c)(1)(C)." *United States* v. *Bustos-Useche*, 273 F.3d 622, 627 (5th Cir. 2001). The "only statutory prerequisite to the district court's jurisdiction" pursuant to subsection (c)(1)(C) "is that the flag nation consent to the enforcement of United States law before trial." *See id.*; *United States* v. *Greer*, 285 F.3d 158, 175–76 (2d Cir. 2002) ("consent under the MDLEA can relate back to activity that occurred before consent"); *United States* v. *Cardales*, 168 F.3d 548, 552 (1st Cir. 1999) (MDLEA's jurisdictional requirement satisfied although consent provided after Coast Guard boarded ship); *United States* v. *Juda*, 46 F.3d 961, 966 (9th Cir. 1995) ("when MDLEA jurisdiction is premised on consent of the flag nation, such consent relates back to activity that occurred prior to consent"). The reasoning undergirding these cases is that the "legitimacy of a flag nation's consent is . . . a question of international law that can be raised only by the foreign nation." *Bustos-Useche*, 273 F.3d at 627; *Greer*, 223 F.3d at 55–56 (Act "requires the consent of foreign nations for purposes of international comity and diplomatic courtesy, not as a protection for defendants").

In this case, the master of the *Captain Richards* orally claimed during the U.S. Coast Guard's right-of-approach questioning that the vessel was Grenadian. *See* 46 U.S.C. § 70502(e)(3) (a "claim of nationality or registry" includes "a verbal claim of nationality or registry by the master or individual in charge of the vessel"). After the U.S. Coast Guard received confirmation from Grenada that the *Captain Richards* was indeed registered in that Nation, the Secretary of State's designee—Commander Tozzi—asked Grenada's

government to waive its primary right to exercise jurisdiction over the vessel, its cargo, and its crew, to the extent necessary for the enforcement of United States law.

U.S. Coast Guard Commander Tozzi certified that Grenada provided the requested waiver, and this certification—which was certified by the Secretary of State—conclusively proves that the vessel is "subject to the jurisdiction of the United States." *See* 46 U.S.C. §§ 70503(a)(1), (e)(1)–(2); 70502 (c)(1)(C), (c)(2)(A)–(B). And this is so although the United States received Grenada's permission to enforce U.S. law only after the U.S. Coast Guard had already boarded the *Captain Richards* on March 1, 2016. *See, e.g.*, *Cardales*, 168 F.3d at 552. Because this case meets the MDLEA's statutory requirements for establishing jurisdiction, defendants' thornier constitutional challenges must be addressed. *See United States* v. *Vilches-Navarrete*, 523 F.3d 1, 10 n.6 (1st Cir. 2008) ("if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter") (quoting *Ashwander* v. *Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

## II.     Constitutional Authority

The MDLEA "is derived from Congress's power" under the Define and Punish Clause, *United States* v. *Mitchell-Hunter*, 63 F.3d 45, 49 n.3 (1st Cir. 2011), and Congress, in making drug trafficking unlawful under the Act, was invoking that power. *United States* v. *Matos-Luchi*, 627 F.3d 1, 3 (1st Cir. 2010). This Clause gives Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. The Clause "encompasses three distinct powers: (i) to define and punish piracy; (ii) to define and punish felonies committed on the high seas; and (iii) to define and punish offenses against the Law of Nations." *United States* v. *Ballestas*, 795 F.3d 138, 146–47 (D.C. Cir. 2015) (citing *United States* v. *Smith*, 18 U.S. (5 Wheat.) 153, 158–59 (1820)). Notably, the Clause does "not explicitly require [that] a nexus between the unlawful conduct committed on the high seas and the United States be established before Congress can punish that conduct." *See Nueci-Pena*, 711 F.3d at 198.

The government relies on the Felonies Clause (i.e., Congress's authority to define and punish felonies committed on the high seas) in contending that the MDLEA is adequately moored to the Constitution. The Eleventh Circuit has held that the "Felonies Clause empowers Congress to punish crimes committed on the high seas." *United States* v. *Campbell*, 743 F.3d 802, 810 (11th Cir. 2014). The Eleventh Circuit has reasoned that "a criminal act does not need a nexus to the United States in order to be criminalized under the MDLEA 'because universal and protective principles support its extraterritorial reach.'"[3] *United States* v. *Cruickshank*, 837 F.3d 1182, 1188 (11th Cir. 2016) (quoting *Campbell*, 743 F.3d at 810).

Put another way, "because the Felonies Clause empowers Congress to punish crimes committed on the high seas, and because 'the trafficking of narcotics is condemned universally by law-abiding nations,'" the Eleventh Circuit has "rejected the argument 'that it is fundamentally unfair for Congress to provide for the punishment of persons apprehended with narcotics on the high seas.'" *Cruickshank*, 837 F.3d at 1188 (quoting *Campbell*, 743 F.3d at 810); *see also Ballestas*, 795 F.3d at 147 (D.C. Circuit held that "Felonies Clause grant[ed] Congress authority to criminalize" defendant's conduct under the MDLEA where defendant was involved in a drug-trafficking conspiracy involving a vessel captured on the high seas, although defendant was not actually aboard the vessel).

The First Circuit has yet to decide whether the Define and Punish Clause (or, more specifically, the Felonies Clause) buttresses Congress's enactment of the MDLEA. *See United States* v. *Trinidad*, 839 F.3d 112, 113 n.1 (1st Cir. 2016) (in most recent First Circuit case involving the Act, the majority of the court found no occasion—despite a forceful dissent—to grapple with whether "Congress exceeded its constitutional authority under

---

[3] Notably, the First Circuit relied on the "protective" principle, in addition to the "territorial" principle, in rejecting the theory that the Due Process Clause requires a nexus between criminal conduct and the United States when the vessel's flag nation has consented to the enforcement of U.S. law. *Cardales*, 168 F.3d at 553 ("application of the MDLEA to the defendants is consistent with the protective principle of international law because Congress has determined that all drug trafficking aboard vessels threatens our nation's security"); *see also infra* Pt. III.

Article I in enacting the MDLEA" because the defendant did not make such an argument, and because, under First Circuit law, "such a challenge would not implicate" the court's "subject-matter jurisdiction"). Yet, the First Circuit has decided some cases arising under the MDLEA, and those cases shed some light on the reasons for rejecting the defendants' constitutional challenge to the Act.

In *Nueci-Peña*, the defendant argued on appeal "that Congress exceeded its authority under" the Define and Punish Clause "in enacting the MDLEA without requiring a nexus between the conduct and the United States." 711 F.3d at 197. But because the defendant presented this challenge for the first time on appeal, the court reviewed the decision below only for plain error. *See id.* Pointing to its "sister circuits' view that the MDLEA is a constitutional exercise of Congress' power under the Piracies and Felonies Clause[4] and the absence of Supreme Court precedent addressing the scope of that power in this context," the First Circuit held that, if the defendant's conviction was the result of any error by the district court, the error was not plain. *Id.* at 198.

As the First Circuit observed in *Nueci-Peña*, other circuit courts have weighed in on the MDLEA's constitutionality. 711 F.3d at 197. Indeed, the Third, Fifth, Ninth, Eleventh, and D.C. Circuits have found a constitutional basis for the MDLEA. *See Ballestas*, 795 F.3d at 146–47 (authority under Felonies Clause); *Campbell*, 743 F.3d at 810 (same); United States v. *Ledesma-Cuesta*, 347 F.3d 527, 531–32 (3d Cir. 2003) ("Congress had authority to enact" the MDLEA's predecessor statute "pursuant to its constitutional power" under the Define and Punish Clause); *United States* v. *Moreno-Morillo*, 334 F.3d 819, 824 (9th Cir. 2003) ("Congress . . . was acting within its constitutionally conferred authority when it passed the MDLEA," specifically, "Article I, Section 8, Clause 10"); *Suerte*, 291 F.3d at 376–77 (the power "to define and punish

---

[4] The "Piracies and Felonies Clause" sometimes refers to the Define and Punish Clause without the "Law of Nations" portion of Article I, § 8, Clause 10—though courts have sometimes treated the former clause as synonymous with the latter. *Compare Ballestas*, 795 F.3d at 146–47, *with Nueci-Peña*, 711 F.3d at 196, *and United States* v. *Suerte*, 291 F.3d 366, 372 (5th Cir. 2002).

Piracies and Felonies committed on the high seas, and Offenses against the Law of Nations is the only specific grant of power to be found in the Constitution for the punishment of offenses outside the territorial limits of the United States") (internal quotations omitted).

Notwithstanding the above, defendants contend that their position is propped by three early Supreme Court decisions. They first highlight *United States* v. *Palmer*, 16 U.S. (3 Wheat) 610 (1818). *Palmer* addressed whether the United States had jurisdiction under the Act of 1790, which prohibited robbery, murder, and certain other offenses on the high seas, "to try, and punish, foreign citizens who had, on the high seas, boarded and robbed a foreign-owned vessel manned by a Spanish crew." *Suerte*, 291 F.3d at 373; *Palmer*, 16 U.S. at 626. The Supreme Court, referring to the Define and Punish clause, stated that Congress was doubtless empowered "to enact laws punishing pirates, although they may be foreigners, and may have committed no particular offence against the United States." *Palmer*, 16 U.S. at 630. The "only question" was whether Congress had done so. *Id.* at 630–31 (emphasis added).

The Supreme Court held that Congress had not done so, reasoning that "it cannot be supposed that the legislature intended to punish" foreigners who committed non-piratical offenses aboard foreign ships. *Id.* at 632. Because such crimes are "offences against the nation under whose flag the vessel sails," and because every nation is capable of punishing such crimes aboard its own vessels, "no general words of a statute ought to be construed to embrace them when committed by foreigners against a foreign government." *Id.* at 632–33. The Court thus construed the statute as applying only to offenses committed aboard United States vessels. *Id.* at 633.

But this limiting construction was not compelled by the Court's interpretation of the Define and Punish Clause. *See Suerte*, 291 F.3d at 373. Rather, as the Fifth Circuit astutely observed, this construction was informed by the interpretive principle that an "act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Id.* at 373–74 (quoting *Murray* v. *The Schooner Charming Betsy*, 6

U.S. (2 Cranch) 64, 118 (1804)). The Court held merely that Congress's "true intent and meaning" was to extend United States jurisdiction only so far as customary under international law. *Palmer*, 16 U.S. at 634. Certainly, the Court did not explicitly hold that, as a constitutional matter, Congress cannot prohibit non-piracy felonies committed by foreigners on foreign vessels. And any doubts as to the nature or breadth of the Court's holding evaporate in light of the Court's later pronouncement that, "notwithstanding a series of contested adjudications on [the Act of 1790], no doubt has hitherto been breathed of its conformity to the constitution." *Smith*, 18 U.S. at 158.

Defendants next underscore *United States* v. *Furlong*, 18 U.S. (5 Wheat) 184 (1820). But their invocation of *Furlong*, which involved the same statute that was at issue in *Palmer*, fares no better. Indeed, the First Circuit has explicitly rejected the argument that *Furlong* "held that Congress does not have the power to punish felonies on the high seas that have no nexus to the United States." *Nueci-Peña*, 711 F.3d at 198 n.7. As the *Nueci-Peña* court explained, *Furlong* was, like *Palmer*, simply "a case about statutory interpretation," and the Supreme Court held no more than that the statute in fact prohibited the defendants' piratical conduct. *Nueci-Peña*, 711 F.3d at 198 n.7.

To complete the trilogy of early Supreme Court cases, defendants emphasize *Smith*. 18 U.S. at 158–60. But their reliance on *Smith* is similarly misplaced, as the First Circuit has also rebuffed the interpretation of *Smith* advanced by defendants. *See Nueci-Peña*, 711 F.3d at 198 n.7. In that case, the sole issue "was whether the Act of 1819's definition of piracy referencing the law of nations was within Congress's power to define and punish piracies." *Id.* (citing *Smith*, 18 U.S. at 158–60). The Supreme Court held only that the definition "was a constitutional exercise of Congress's power to define piracies and that piracy is defined by the law of nations as 'robbery upon the sea.'" *Id.* (citing *Smith*, 18 U.S. at 160–62). While *Smith* may support defendants' claim that Congress's Article I authority over "Piracies" does not extend to drug trafficking, it has nothing to say about the scope of the power to "define and punish . . . Felonies committed on the high seas." *See id.*

After striking out with these three Supreme Court cases, defendants further attempt to narrow the scope of Congress's power to "define and punish . . . Felonies committed on the high Seas" by relying on *United States* v. *Bellaizac-Hurtado*, 700 F.3d 1245 (11th Cir. 2012). They suggest *Bellaizac-Hurtado* supports the proposition that Congress's power under the Felonies Clause is limited to offenses recognized by customary international law. In that case, the "Eleventh Circuit found that the application of the MDLEA to the defendants' conduct lay beyond Congress's constitutional authority." *Ballestas*, 795 F.3d at 147. But importantly—as the D.C. Circuit astutely observed—"the government in *Bellaizac–Hurtado* relied solely on the Law of Nations Clause to support the constitutionality of the MDLEA's application." *Id.*

In light of the government's theory, the Eleventh Circuit vacated the defendants' convictions, holding "that 'drug trafficking is not a violation of customary international law and, as a result, falls outside the power of Congress under the [Law of Nations] Clause.'" *Id.* (quoting *Bellaizac-Hurtado*, 700 F.3d at 1249). But, contrary to defendants' suggestion, "*Bellaizac–Hurtado* did not address whether any alternative source of congressional authority—such as the Felonies Clause—could serve to criminalize the defendants' conduct." *Ballestas*, 795 F.3d at 147. Indeed, the *Bellaizac–Hurtado* court noted that the Eleventh Circuit has "always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause." 700 F.3d at 1257. The government relies on the Felonies Clause—not the Piracies Clause or the Law of Nations Clause—to defend the MDLEA's constitutionality in this case, and so defendants' reliance on *Bellaizac–Hurtado* is misplaced.

After canvassing the case law on which defendants primarily rely, and finding that this authority does not support defendants' position, their theory is untenable. "Statutes duly enacted by Congress are presumed to be constitutional," and defendants have failed to meet their burden of showing that the MDLEA is constitutionally unsound. *See United States* v. *Sampson*, 486 F.3d 13, 20 (1st Cir. 2007). Indeed, in light of the circuit court cases

finding a textual basis in the Constitution for the MDLEA, and in light of the defendants' failure to come forward with a single circuit court case holding otherwise, I find that the defendants' theory sails against the wind and calls upon this court to drift into perilous and uncharted waters.

To be sure, defendants also contend that the MDLEA "cannot constitutionally reach" their conduct because the Act's "statelessness provision" extends broader than international law. There are at least three problems with this argument. As an initial matter, "compliance with international law does not determine whether the United States may apply the Act to" defendants' conduct. *See United States* v. *Davis*, 905 F.2d 245, 248 (9th Cir. 1990); *see also Ballestas*, 795 F.3d at 144 ("if 'a statute makes plain Congress's intent,' a court 'must enforce the intent of Congress irrespective of whether the statute conforms to customary international law'") (quoting *United States* v. *Yousef*, 327 F.3d 56, 93 (2d Cir. 2003)). Indeed, "Congress is not bound by international law," and thus "it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law." *Yousef*, 327 F.3d at 86.

Second, defendants' argument flows from an unfounded premise. It is true that the MDLEA's definition of a vessel "subject to the jurisdiction of the United States" also includes "a vessel without nationality." 46 U.S.C. § 70502(c)(1)(A). A "vessel without nationality" includes "a vessel aboard which the master or individual in charge": (1) "makes a claim of registry that is denied by the nation whose registry is claimed"; (2) "fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel"; and (3) "makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." *See* 46 U.S.C. §§ 70502(d)(1)(A)–(C). But Grenada confirmed that the vessel was registered in that Nation, and thus the

*Captain Richards* was not "a vessel without nationality."[5] *Compare* 46 U.S.C. §§ 70502(c)(1)(A); 70502(d)(1)(A)–(C) (three categories of vessels meet the definition of a "vessel without nationality," and none of those categories are applicable to the circumstances here), *with id.* § 70502(c)(1)(C) (jurisdiction is established when the vessel's nation consents or waives objection to enforcement of U.S. law by the United States).

Third, when—as here—the government establishes that a vessel is subject to the jurisdiction of the United States pursuant to § 70502 (c)(1)(C), the MDLEA is not in tension with international law. *See Suerte*, 291 F.3d at 375–76. This is because subsection (c)(1)(C) "codifies the . . . generally accepted principle of international law: a flag nation may consent to another's jurisdiction." *See id.* (citing RESTATEMENT (THIRD) § 522 reporters note 8 (the MDLEA "*confirmed the practice*" of relying on informal grants of consent by flag nations (emphasis added)); Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 3-12 n.41 (3d ed. 2001) (the principle that flag-nation consent satisfies international law requirements "is *confirmed* by the MDLEA") (emphasis added))). Thus, because the Felonies Clause provided sufficient congressional authority to enact the MDLEA,[6] and because international law is not at odds with the MDLEA under the circumstances here, this court should reject the defendants' constitutional challenge to the Act.

## III. Due Process

Defendants next contend that the MDLEA violates the Due Process Clause of the Fifth Amendment by criminalizing conduct lacking a nexus to the United States. But the First Circuit and all other circuit courts—save one—have held that "due process does not

---

[5] In any event, defendants' contention would not hold water even if the *Captain Richards* was indeed a "stateless" vessel because "the United States, as a matter of international law, may prosecute drug offenders on stateless ships found on the high seas." *United States* v. *Victoria*, 876 F.2d 1009, 1010 (1st Cir. 1989) (Breyer, J.).

[6] For this reason, the Act's constitutionality does not depend, as defendants suggest, on Congress's authority to enact legislation effectuating a treaty. *See United States* v. *Salazar-Realpe*, No. CRIM. 15-087 PAD, 2015 WL 3820757, at *3 (D.P.R. June 18, 2015) ("Because . . . the MDLEA is constitutionally valid under the Define and Punish Clause, there is no need to evaluate the extent to which congressional power may be augmented through the Treaty Power Clause").

require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under the MDLEA when the flag nation has consented to the application of United States law to the defendants." *Cardales*, 168 F.3d at 553; *see also United States* v. *Wilchcombe*, 838 F.3d 1179, 1186 (11th Cir. 2016) ("of the . . . circuits to have considered this question," which include the First, Third, Fifth, Ninth, and Eleventh Circuits, "all but one"—the Ninth Circuit—"share" the Eleventh Circuit's "view"). Because the government in this case established that the *Captain Richards* is subject to the jurisdiction of the United States pursuant to § 70502(c)(1)(C), this court is bound by *Cardales*'s holding and should, therefore, reject defendants' due process challenge.

To be sure, defendants attempt to wiggle out of *Cardales*'s holding by strangely stating in their motion that the U.S. Coast Guard "received no consent to enforce U.S. criminal law against the defendants." Docket No. 43 at 14–15. To the extent this argument seeks to draw a distinction between a flag nation's *consent* and a flag nation's *waiver*, the court should reject that argument for at least two reasons. First, the court should deem this contention waived because the defendants, at best, raised this argument only implicitly and failed to develop it with any meaningful specificity. *See United States* v. *Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Second, a variant of that argument was recently rejected by the Eleventh Circuit. *See Winchcombe*, 838 F.3d at 1186. In *Winchcombe*, a Coast Guard Commander, acting as the Secretary of State's designee, "certified to the district court that the Bahamian Government notified the Government of the United States that it waived its right to exercise primary jurisdiction over" a vessel registered in the Bahamas. *Id.* The defendants complained of alleged "defects in the language of the" statement of no objection ("SNO") provided to the United States, which the U.S. government sought from the Bahamas in order to establish jurisdiction over the vessel pursuant to § 70502(c)(1)(C). *Id.* The Eleventh Circuit rejected the defendants' contention—holding that the "SNO . . . was

sufficient to inform the United States that the Bahamian Government *consented* to the United States' exercise of jurisdiction over" the vessel. *Id.* at 1187 (emphasis added).

In this case, as in *Winchcombe*, U.S. Coast Guard Commander Tozzi certified that Grenada waived its primary right to exercise jurisdiction over the *Captain Richards*, and this "was sufficient to inform the United States that the [Grenadian] Government consented to the United States' exercise of jurisdiction over" the vessel. *See id.* at 1187; *see also United States* v. *Kurdyukov*, 48 F. App'x 103, *3 (5th Cir. 2002) ("In *Suerte*, we held that, for extraterritorial application of the MDLEA, the Due Process Clause of the Fifth Amendment does not require a nexus between the foreign citizen and the United States, where the flag nation of the vessel has consented *or waived objection* to the enforcement of United States law by the United States.") (emphasis added). Thus, the court should reject the defendants' due process challenge to the MDLEA.

## CONCLUSION

For the foregoing reasons, the motions to dismiss should be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas* v. *Arn*, 474 U.S. 140, 155 (1985); *Davet* v. *Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co.* v. *Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden* v. *Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**
In San Juan, Puerto Rico, this 11th day of May 2017.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge